STATE OF UTAH
UTAH COUNTY

2008 APR 25  P 4: 32

Grant M. Sumsion (06445)
Jason S. Crandall (08327)
**SUMSION & CRANDALL**
86 North University Avenue, Suite 400
Provo, UT 84601
     Telephone: (801) 426-6888

*Attorneys for Plaintiffs*

---

IN THE FOURTH JUDICIAL DISTRICT COURT

UTAH COUNTY, STATE OF UTAH

| | |
|---|---|
| WRIGHT THURSTON and TREVOR KEYES, <br><br>       Plaintiffs, <br><br> v. <br><br> PINNACLE SECURITY, LLC, a Utah limited liability company; CHAD CHRISTOFFERSON, CHRIS MUNDAY, JOHN BARLOW, STEVE ZOLMAN, KELLY WALKER, and JARED CHAPPELL <br><br>       Defendants. | **COMPLAINT** <br><br><br> Civil No. 080401343  MI <br><br> Judge McDade |

For cause of action, Plaintiffs allege against the Defendants as follows:

**GENERAL ALLEGATIONS**

1.      Plaintiffs Wright Thurston and Trevor Keyes are residents of the State of Utah, Utah County.

2.      Defendant Pinnacle Security, LLC ("Pinnacle") is a Utah limited liability company with its principle place of business in Utah County, Utah.

3.      Defendant Chad Christofferson ("Christofferson") is a resident of the State of Utah, Utah County.

4.   Christofferson has at times past been the owner of a majority interest in Pinnacle.  On information and belief, Christofferson presently owns the largest interest in Pinnacle, but that interest is less than a majority interest.

5.   On information and belief, Defendant Chris Munday ("Munday") is a resident of the State of Utah.

6.   Munday is now, and has been for all times relevant to this action, the Chief Executive Officer (CEO) of Pinnacle.

7.   On information and belief, Defendant John Barlow ("Barlow") is a resident of the State of Utah.

8.   Barlow is now, and has been since at least September 2007, a licensed member of the Utah State Bar and general counsel for Pinnacle.

9.   On information and belief, Defendant Steve Zolman ("Zolman") is a resident of the State of Utah.

10.   Zolman is now, and has been since at least September 2007, the President of Provo Recruiting for Pinnacle.

11.   On information and belief, Defendant Kelly Walker ("Walker") is a resident of the State of Utah.

12.   Walker is now, and has been since at least September 2007, the President of Operations for Pinnacle.

13.   On information and belief, Defendant Jared Chappell ("Chappell") is a resident of the State of Idaho.

2

14.    Chappell is now, and has been since at least September 2007, the President of Rexburg Recruiting for Pinnacle.

15.    On information and belief, Pinnacle is owned by Christofferson, Zolman, Walker and Chappell.  Christofferson, Zolman, Walker and Chappell, together with any additional persons who are or may be owners of Pinnacle are referred to hereinafter as the "Pinnacle Owners."

16.    The Managers of Pinnacle are, and have been at all times relevant to this action, Christofferson, Zolman, Walker and Chappell.

17.    The acts complained of herein occurred primarily in the State of Utah.

18.    On or about March 2002, Plaintiffs formed Firstline Security, Inc., a Utah corporation ("Firstline").

19.    Plaintiffs are the sole shareholders of Firstline.

20.    From its inception, Firstline was engaged primarily in the business of door-to-door sales and marketing of home security systems.

21.    Firstline also provided monitoring services for its home security customers, until the monitoring of those customers' service agreements were sold to other monitoring companies.

22.    Firstline was also engaged in the sales, installation, and service of voice over internet protocol (VOIP) home telephone services.

23.    The vast majority of Firstline's revenue was generated by the sales efforts of sales representatives who contract to sell the Firstline services door to door during the summer months.

3

24.    As with other companies in Firstline's industry, including Pinnacle, the revenue that Firstline was able to generate was proportional to the number of qualified and effective sales representatives Firstline was able to recruit and retain to work for multiple summer selling seasons.

25.    The recruitment and retention of sales representatives is of great value to Firstline and other companies in Firstline's industry, including without limitation, Pinnacle.

26.    While operating Firstline, Plaintiffs had developed a large cadre of sales representatives who were qualified and effective, who generated large numbers of sales of alarm services, and who were loyal to Plaintiffs.

27.    The relationships between Plaintiffs and the sales representatives who were loyal to Plaintiffs was of great value to Plaintiffs.

28.    In the alarm industry, there is fierce competition among alarm companies to recruit and retain sales representatives.

29.    The ability to recruit and retain sales representatives depends to a large extent upon the credibility of the companies and the personal relationships that the management of the companies have with their sales representatives.

30.    Firstline experienced substantial growth in the number of sales representatives, number of security service contracts sold, and gross sales from 2004 through and including 2007.

31.    Firstline required substantial infusions of capital to fuel its continued growth.

32.    Beginning in October 2006, Plaintiffs worked with Mike Barnes of Barnes & Associates (hereinafter "Barnes"), an investment banker who had participated directly in several company sales transactions in the home security industry, including sales of companies substantially similar to Firstline.

Barnes had closely analyzed Firstline's business and was preparing documents to be presented to potential investors.

33.    Based partially upon Barnes' advice, Plaintiffs determined that it would be advisable to seek significant funding through either debt or equity sources to allow Firstline to service customer accounts in-house for a period of time to maximize the value of Firstline through recurring monthly service revenue.

34.    At the same time that Plaintiffs were in discussions with Barnes, Plaintiffs were also in discussions with other potential sources for funding, including McGinn, Smith & Co, Inc.(hereinafter "McGinn").

35.    By November 2007, Barnes had made significant progress and was prepared to schedule meetings between Plaintiffs and approximately twenty banks that were potential sources of funding.

36.    Barnes scheduled these meetings to occur in January and February 2008.

37.    Because the funding that Barnes was working on was several months away, Plaintiffs determined that Firstline would need immediate financing for approximately $1,500,000 to $2,000,000 before the investor meetings that Barnes had scheduled.

38.    Plaintiffs stepped up their discussions with McGinn, who had provided debt financing for Firstline in the past.

39.    In late November or early December 2007, McGinn offered to make a significant financial investment in Firstline in the total amount of approximately thirty million dollars ($30,000,000) to thirty-five million dollars ($35,000,000).

40.    McGinn's offer contemplated an equity investment in Firstline of approximately $10,000,000 together with a commitment for additional debt financing of $20,000,000 to $25,000,000. In return, McGinn would received stock totaling approximately 30% of the outstanding shares of Firstline.

41.    Also in November 2007, Plaintiffs began discussions with other investors familiar with the home security industry who expressed willingness to provide financing to Firstline.

42.    At the time that Plaintiffs were evaluating the various financing alternatives available to Firstline, Thurston received a call from Christofferson, asking to meet to discuss Firstline and Pinnacle.

43.    Despite the fact that Firstline and Pinnacle were competitors in the same industry, this phone call from Christofferson was not out of the ordinary.

44.    Thurston and Christofferson had been friends and neighbors since 2004 when Thurston moved next door to Christofferson.

45.    Thurston and Christofferson developed a relationship of trust and confidence from 2004 through 2007 by their associations as friends, neighbors, and members of the same religious organization.

46.    Thurston and Christofferson were not only members of the same local unit (ward) of the Church of Jesus Christ of Latter-Day Saints, they served together as youth leaders with shared responsibilities for the same age group of boys in that organization.

47.    Working together in their shared youth leadership responsibilities caused Thurston and Christofferson to spend significant amounts of time together and build a substantial relationship of trust and confidence.

48. As a result of this relationship of trust and confidence, Thurston and Christofferson discussed their businesses frequently.

49. In 2006 and 2007, Firstline and Pinnacle jointly negotiated preferred pricing terms with certain suppliers of equipment common to both companies, GE and Alarm.com.

50. Firstline and Pinnacle met to jointly discuss ways to eliminate or reduce summer start up costs.

51. Keyes and Walker had a meeting at Walker's office where they compared pricing, office start up costs, offered vendor contacts and pricing, and other aspects of the summer program to help each other receive more competitive deals and develop more efficient operating models. In this meeting Keyes and Walker openly shared "business confidential" data including equipment pricing, apartment pricing, apartment lease terms, furniture rental rates, furniture rental lease terms, and credit terms and pricing with the majority of their vendors.

52. Firstline and Pinnacle jointly negotiated pricing with a DHL and Federal Express wholesaler to receive better shipping rates.

53. In many other ways Plaintiffs had worked with Pinnacle, Pinnacle Owners, and other Pinnacle employees in ways that built a relationship of trust and confidence between Plaintiffs and Defendants.

54. As part of these dealings with GE, Alarm.com, DHL, FedEx, and others, Plaintiffs and Defendants had become familiar with each other and had developed a relationship of trust and confidence as a result of which Plaintiffs had grown to trust Defendants.

7

55.     As a result of the dealings between Firstline and Pinnacle, the parties became familiar with the business of the other, including information that would normally be considered confidential and proprietary in nature.

56.     This was done by both companies without the use of any written agreement or even any written confidentiality agreement to keep information confidential.

57.     Plaintiffs and Firstline on the one hand, and Defendants on the other had a relationship that allowed them to share information without a written confidentiality agreement.

58.     Notwithstanding the lack of written agreements between Firstline and Pinnacle protecting confidentiality, the parties agreed to keep the confidential information of the other confidential.

59.     Notwithstanding the lack of written agreements between the parties protecting confidentiality, Pinnacle had never, prior to January 2008, betrayed the confidence of Plaintiffs or Firstline.

60.     As a result of their long working relationship, and the close relationship between Thurston and Christofferson, it was reasonable for Plaintiffs to rely on the oral representations of Defendants, particularly those made by Christofferson to Thurston.

61.     Shortly after Thurston received the telephone call from Christofferson in November 2007, the two met for lunch.

62.     At lunch, Thurston and Christofferson discussed Firstline's financial position and needs for immediate funding.

63.     The discussion between Thurston and Christofferson included disclosure of the possible financing from McGinn and others.

8

64.    During those discussions Christofferson suggested a possible merger of Firstline and Pinnacle as a potential solution to Firstline's financing issues.

65.    Christofferson informed Thurston that Pinnacle had obtained extensive financing, including a fifty million dollar ($50,000,000.00) line of credit from Zions Bank and LaSalle Bank.

66.    Christofferson represented to Thurston that the combination of Plaintiffs' ability to recruit effective sales managers and representatives with Pinnacle's existing financing would allow the two companies to be much more successful together than they could be as competitors.

67.    During these discussions Christofferson represented to Thurston that Pinnacle's CEO (Munday) was a consultant for the leadership of Zions Bank and that Munday was able to get Pinnacle a one hundred million dollar ($100,000,000.00) line of credit.

68.    Thurston and Christofferson also discussed the immediate need for financing to pay certain ongoing expenses of Firstline.

69.    At the conclusion of the November lunch meeting, Thurston and Christofferson agreed to speak with the other owners of their respective companies about this possible combination.

70.    Shortly after the lunch meeting, Thurston discussed the events of the meeting with Keyes.

71.    On information and belief, Christofferson also discussed the events of the lunch meeting with the Pinnacle Owners and with  Munday and Barlow.

72.    Plaintiffs and Christofferson, Zolman, Walker, Chappell, Munday and Barlow met shortly thereafter, and on repeated occasions, to discuss more details regarding a possible combination and Firstline's pressing financing needs.

9

73.    Defendants were aware that Plaintiffs had other financing options for Firstline, including a potential transaction with McGinn and another potential investor.

74.    The parties engaged in extensive and detailed discussions regarding their joint belief that a combined company would be able to recruit significant numbers of effective sales managers and sales representatives to generate a substantial number of home security service agreements becoming, in Munday's words, "the largest residential home security company."

75.    During this discussion, Defendants repeated Christofferson's prior representations regarding Munday's ability to obtain operating capital from Zions bank, including a representation of this fact from Munday to Keyes.

76.    Defendants represented to Plaintiffs that in the preceding year, Pinnacle had earnings before interest, taxes, depreciation and amoritization (EBITDA) of twenty million dollars ($20,000,000.00).

77.    Defendants' representation included an explanation that their fifty million dollar credit facility gave them the ability to keep their accounts without selling them for an average of eight months and helped create such EBITDA (50,000 accounts paying $44.99 per month times 8 months equals $17.996 million before the earnings of the sale of the accounts).

78.    Pinnacle's representations regarding their business plan and model of holding the accounts were highly material to Plaintiffs, who calculated that because Pinnacle would be able to raise more than $100 million in 2008, the combined forces of Pinnacle and Firstline would be able to more than double the EBITDA that Pinnacle had achieved previously.

10

79.    Christofferson, Munday, and the other Defendants made the statements regarding Munday's ability to obtain capital from Zions Bank and regarding Pinnacle's EBITDA for the purpose of inducing Plaintiffs to enter into a business relationship with Pinnacle.

80.    Plaintiffs believed Defendants' statements regarding the ability of Munday and Pinnacle to obtain capital from Zions Bank and the statements regarding Pinnacle's EBITDA.

81.    With their combined efforts, Plaintiffs and Defendants believed that post-"merger" Pinnacle would be able to secure sufficient funding to allow Pinnacle to service a much greater number of alarm accounts in-house and generate substantially increased recurring monthly revenue.

82.    With the projected increase in recurring monthly revenue, the post-"merger" Pinnacle would have grown to be worth more than five hundred million dollars ($500,000,000.00), perhaps over one billion dollars ($1,000,000,000.00).

83.    After extensive discussions, Plaintiffs and Defendants determined that a combination of their two companies, Firstline and Pinnacle, could be a very powerful company in the home security industry because combining their forces would result in a synergism whereby the resulting enterprise would be more powerful, profitable, and valuable than the sum of the parts.

84.    During those discussions, the parties determined that the contemplated transaction could be accomplished most efficiently by Plaintiffs becoming owners of Pinnacle and then using their best efforts to bring the Firstline sales force to work for Pinnacle through a period of transition.

85.    During the transition period, the parties contemplated that Firstline would continue limited operations as necessary to pay its creditors and wind up its business, which could include keeping a small sales force, if needed, to generate sufficient revenue to pay all of Firstline's obligations.

86.     The parties agreed at that time, in late November 2007, to combine their operations in such a way that Plaintiffs would become owners of Pinnacle, and the operations staff, sales representatives, and technicians of Firstline who were loyal to Plaintiffs would go to work for Pinnacle.

87.     As part of that agreement, Defendants agreed to loan Plaintiffs funds to cover immediate cash needs of Firstline in the amount of approximately $2,000,000.

88.     Plaintiffs and Christofferson, Barlow and Zolman discussed the timing of Firstline's needs for the funds and determined that the $2,000,000 would be sufficient to cover the short term cash needs of Firstline until the first week of January 2008, by which time the parties contemplated that the combination of Firstline and Pinnacle would be completed.

89.     Defendants asserted that because the agreement to combine operations was being made with Plaintiffs personally, the loan for Firstline's short term cash needs should be made to Plaintiffs personally as well.  Plaintiffs agreed to this arrangement.

90.     After this agreement was reached, but before the loan was funded, Christofferson and Barlow explained to Plaintiffs that because of certain restrictive bank covenants related to Pinnacle's line of credit with Zions Bank, the loan would need to be made by Christofferson personally.

91.     Subsequently, on the day the loan proceeds were to be distributed to Plaintiffs, Defendants informed Plaintiffs that because the loan was to be made by Christofferson instead of Pinnacle, it would not be funded all at once, but rather over a period of time in a series of loan distribution installments.

92.     Each installment of the loan that was made was funded by way of wire transfers into an account belonging to Thurston.

93.    On or about December 1, 2007, Pinnacle delivered to Plaintiffs a proposed letter of intent ("LOI") for Plaintiffs to become owners of Pinnacle with the other Pinnacle Owners.

94.    Because the proposed LOI was between Plaintiffs and Pinnacle, Plaintiffs retained attorney Jason Crandall of Sumsion & Crandall as legal counsel to represent Plaintiffs individually in completing the proposed transaction.

95.    Although the proposed transaction was with Plaintiffs, the substance of the transaction was a combination of the entire business of Firstline with Pinnacle.

96.    As part of this combination of Plaintiffs and Pinnacle, the parties contemplated and expected that Plaintiffs would transition all or substantially all of the Firstline operations to Pinnacle.

97.    In fact, Christofferson and Walker began working almost immediately after the LOI was signed to get certain operational staff of Firstline moved to Pinnacle.

98.    Also material to the ultimate agreement between Plaintiffs and Defendants was the agreement of Pinnacle to absorb certain recruiting and operational offices of Firstline, including all of the expenses associated therewith.

99.    On December 14, 2007, Plaintiffs and Pinnacle executed an LOI containing certain binding and certain non-binding provisions.

100.    Under the terms of the LOI, the parties contemplated that Plaintiffs would recruit and train sales personnel for Pinnacle.

101.    In exchange for these recruiting and training efforts, Plaintiffs would receive the same compensation as the other Pinnacle Owners and would receive an ownership interest in Pinnacle.

102.    Plaintiffs were to receive up to a 32% membership interest in Pinnacle based upon the total number of new security monitoring contracts initiated by the sales personnel recruited by Plaintiffs.

103.    The LOI also contained certain binding provisions including a provision to keep the contents of the LOI confidential.

104.    The confidentiality provisions of the LOI were material to Plaintiffs' agreement to enter into the transaction.

105.    Plaintiffs and Defendants knew that the critical relationships between Plaintiffs and the sales representatives who were loyal to them would be damaged if Plaintiffs were to provide inconsistent or false information to their sales representatives regarding the contemplated transaction.

106.    Plaintiffs could not, therefore, deny to their sales representatives the existence of discussions with Pinnacle, and then later enter into a transaction with Pinnacle and expect the sales representatives to remain loyal.

107.    Although not part of the LOI, the transition of the Firstline operations staff and recruiting offices to Pinnacle remained a part of the planned combination of the two companies.

108.    Defendants represented that they would complete definitive agreements consummating the transaction contemplated in the LOI as soon as possible.

109.    Plaintiffs were told by Christofferson and Zolman that Barlow was preparing the definitive agreement and documents necessary to complete the transaction described in the LOI.

110.    On information and belief, on or before January 5, 2008, Defendants disclosed the existence of the LOI and the contemplated transaction to Brandon Kennedy.

14

111.    On information and belief, after learning of the transaction contemplated by the LOI, Mr. Kennedy called one of Firstline's top Division Presidents, Jared Taggart.

112.    On information and belief, Mr. Taggart met with Christofferson, Zolman and Munday who confirmed the existence of the contemplated transaction.

113.    On information and belief, after meeting with Defendants, Mr. Taggart then discussed the contemplated transaction between Plaintiffs and Pinnacle with other top sales managers of Firstline, particularly those at the highest level – the Division Presidents.

114.    These Division Presidents then approached Plaintiffs regarding the contemplated transaction with Pinnacle.

115.    Because the Division Presidents had already been told of the discussions between Plaintiffs and Pinnacle, Plaintiffs had no choice but to discuss the proposed transaction, as well as the other financing options that Plaintiffs and Firstline were considering, with the Division Presidents.

116.    On or about January 9, 2008, some of these Division Presidents were introduced to Defendants at meetings arranged by Plaintiffs.

117.    On information and belief, some of the Division Presidents had individual meetings with Defendants, outside the presence of Plaintiffs, wherein Defendants discussed the pending agreement between Plaintiffs and Pinnacle.

118.    During this same time, Plaintiffs approached Christofferson, Zolman and Walker about the urgency of completing the definitive agreements because the uncertainty that existed among Firstline's Division Presidents and top sales managers was creating severe challenges for Plaintiffs in recruiting and retaining sales representatives.

15

119.    Plaintiffs and Christofferson, Zolman, Walker, Chappell, Barlow and Munday finally met to finalize the definitive agreement on the evening of January 10, 2008, from approximately 6:00 p.m. until after 10:00 p.m. at Pinnacle's offices in Orem, Utah.

120.    The meeting began in Walker's office, where Plaintiffs were told that no draft definitive agreement had been completed.

121.    Plaintiffs were told that Plaintiffs' agreement with Pinnacle needed to move forward without a written agreement.

122.    The parties discussed in detail the terms under which the agreement was to proceed. The terms that were discussed at the January 10, 2008 meeting were substantially similar to the terms contained in the LOI.

123.    At the January 10, 2008 meeting, Defendants represented and agreed that Plaintiffs would be paid as the other Pinnacle Owners, with one modification; Plaintiffs were to receive the same $200,000 annual salary, but instead of receiving $10 per new account generated by Pinnacle during the year, Plaintiffs were each to receive a $20 bonus per new account generated by the sales personnel directly or indirectly recruited by Plaintiffs during the year.

124.    Significant to this agreement was that Plaintiffs were to receive an ownership interest in Pinnacle of up to 32%, but that this ownership was going to be kept quiet until certain issues with Firstline creditors could be resolved.

125.    Consistent with their discussions previous, Defendants agreed to assist Plaintiffs in settling certain debts and obligations of Firstline. Defendants agreed to participate in a joint negotiation with certain creditors that were common between Firstline and Pinnacle.

126.    Also consistent with their previous discussions, Plaintiffs and Defendants agreed to transition Firstline operations and recruiting offices to Pinnacle as soon as possible.

127.    Part of the oral agreement reached on January 10, 2008 was that for at least the 2008 summer sales season the sales representatives, technicians, and other personnel that had worked for Firstline and who came to work for Pinnacle would be paid on a pay scale that is at least as good as the pay scale upon which they had been paid at Firstline.

128.    Barlow was in attendance for significant parts of this meeting on January 10, 2008.

129.    Plaintiffs' attorney, Jason Crandall, was not in attendance at this meeting.

130.    Plaintiffs' attorney, Jason Crandall, was not even made aware that the meeting was proceeding. Mr. Crandall did not learn of the meeting until days later.

131.    Barlow was aware that Mr. Crandall represented Plaintiffs because Barlow and Crandall had dealt together regarding the LOI and had communicated regarding the transaction after the LOI was executed.

132.    Once the details of the agreement were understood by Plaintiffs and Defendants, the meeting moved to Munday's office where Plaintiff Thurston again requested that Defendants clarify the deal.

133.    Defendants again explained Plaintiffs' compensation and ownership, outlining the details and the parties again agreed to move forward.

134.    The focus of the meeting then shifted to the announcement of the deal to Plaintiffs' top sales personnel, who were flying into the area for a retreat and meeting that had been previously scheduled for the following day.

17

135.    Barlow explained to Plaintiffs that it was best for Plaintiffs and Pinnacle (of which Plaintiffs understood they were part now that the agreement had been made) that no mention be made of any "merger" or Plaintiffs' status as owners of Pinnacle.

136.    Barlow represented that it would be better if before news of the agreement between Plaintiffs and Defendants became public, the parties could jointly approach the creditors of Firstline to explain to them that despite the new arrangement between Plaintiffs and Pinnacle, and the consequent devastation of Firstline's sales force, Plaintiffs and Pinnacle would work together to ensure that the creditors would be paid.

137.    Defendants represented that such discussions involving Plaintiffs, Defendants, and the creditors of Firstline would occur in very short order, so that Plaintiffs would be able to openly pursue their efforts to recruit the sales force loyal to Plaintiffs to work for Pinnacle.

138.    Based on the representations made by Barlow and the other Defendants, Plaintiffs agreed to keep quiet about their deal with Defendants long enough to allow Plaintiffs and Defendants to meet with Firstline's creditors and assure them that they would be paid.

139.    Upon Thurston's request that Defendants clarify the nature of the relationship, Barlow Christofferson, Zolman and Munday all confirmed that Plaintiffs' ownership interest in Pinnacle would be disclosed soon, when negotiations with certain Firstline creditors were completed.

140.    Upon Thurston's request that Defendants clarify the nature of the relationship, Barlow Christofferson, Zolman and Munday all confirmed that the agreement would also ultimately be put in writing once the timing was appropriate.

18

141.    During the meeting, Plaintiff Keyes worked on a statement that would be delivered to Firstline's sales representatives the following day and would be consistent with the parties' agreement to keep quiet about Plaintiffs' ownership interest in Pinnacle. Barlow reviewed the statement and provided advice on changes that should be made to the statement to put the parties in the best possible legal position vis a vis Firstline's creditors.

142.    The next morning, January 11, Plaintiffs again met in Munday's office with Munday, Barlow, Christofferson and Zolman before Plaintiffs' top sales managers were brought to a meeting at Pinnacle's offices.

143.    On the morning of January 11, Barlow, Munday, Christofferson and Zolman reviewed what Keyes intended to say to the sales managers regarding the move to Pinnacle. Defendants represented, and Plaintiffs understood, that the reason for the review was to ensure that all parties were "on the same page" and told a consistent story to the sales managers.

144.    On the morning of January 11, Barlow and Munday edited the prepared statement and again explained the things not say in order to limit the parties' exposure under the agreement.

145.    Defendants made the statements that they made to Plaintiffs at the January 10 meeting and on the morning of January 11 for the purpose of inducing Plaintiffs to encourage the sales representatives who were loyal to Plaintiffs to work for Pinnacle during the upcoming summers sales season and to effectively transition all of Firstline's business to Pinnacle.

146.    Defendants knew that once Plaintiffs encouraged their sales representatives to work for Pinnacle, Plaintiffs would lose substantial credibility with their sales representatives if they thereafter attempted to discourage them from working for Pinnacle.

19

147.     Defendants knew that once Plaintiffs encouraged their sales representatives to work for Pinnacle, it would be very difficult or impossible for Plaintiffs to recruit those sales representatives back to work for Firstline because of the inconsistent and mixed message that would be conveyed.

148.     Two meetings were then held on January 11, 2008, where Plaintiffs' top sales personnel were introduced to the move to Pinnacle. In attendance at these meetings were approximately 40 of Plaintiffs' top sales and installation personnel.

149.     These top sales personnel managed and greatly influenced all of Firstline's sales force, which consisted of approximately 1,250 sales representatives and 500 technicians for the 2007 sales season.

150.     The returning 2008 sales force consisting of over 600 experienced sales representatives and almost 300 experienced technicians, likely would have followed the top Firstline personnel to Pinnacle and resulted in Plaintiffs recruiting over 2,000 sales representatives for the 2008 sales season. The 1,250 sales representatives recruited for the 2007 season began with approximately 200 returning experienced sales representatives.

151.     The parties all expressed the belief that the January 11, 2008, meeting with Plaintiffs' top sales personnel was important to recruiting the vast majority of the existing Firstline sales force.

152.     Keyes first announced the plan for the sales personnel to move to Pinnacle by delivering the prepared statement and then introduced Munday who conducted the majority of the meeting.

153.     On information and belief, certain of Defendants including at least Barlow, Christofferson, Chappell, Zolman and Munday, met with Plaintiffs' top sales personnel in individual meetings without the presence of Plaintiffs.

154.    On information and belief, as early as January 11, 2008 Defendants, while outside Plaintiffs' presence, told at least some of Plaintiffs' top sales personnel that Plaintiffs were not going to be a part of Pinnacle going forward, contrary to both the agreement reached the night before and the statements made to the group in the earlier meeting.

155.    Later that day, some of the sales personnel approached Plaintiffs and explained that they had been told that Plaintiffs were not going to be involved with Pinnacle going forward.  This was very confusing and discouraging to Plaintiffs' top sales personnel who understood that Plaintiffs were to be involved in a major capacity at Pinnacle, although they did not know the exact details.

156.    This also came as a big surprise to Plaintiffs.

157.    Thurston met with Christofferson and Zolman regarding the alleged statements.

158.    Christofferson and Zolman denied that any such statements had been made to any of the sales personnel and reiterated that the existing agreement between Plaintiffs and Pinnacle was still in effect.

159.    Zolman told Thurston that notwithstanding what they were hearing from the sales representatives, the agreement between the parties remained in force and that Pinnacle and the Pinnacle Owners would honor the agreement.

160.    Christofferson thereafter visited with Thurston and Thurston's wife at Thurston's home and, consistent with the close, confidential relationship that existed Christofferson and Thurston, assured Thurston that Pinnacle and the Pinnacle Owners were proceeding with the agreement the parties had reached.

161.    Christofferson asserted that the only statements that were being made by Pinnacle, the Pinnacle Owners, and others on their behalf were intended to protect Pinnacle from liability to Firstline's creditors so the parties all needed to proceed carefully, but that those statements did not in any way alter the agreement between the parties.

162.    Plaintiffs were again told by several key sales personnel that Defendants were telling the sales personnel that Plaintiffs were not going to be involved with Pinnacle in the future.

163.    Christofferson and Zolman again assured Plaintiffs that no such statements were made to these sales personnel and that the agreement was still in effect.

164.    During this time, Plaintiffs, Christofferson and Walker continued their efforts to transition the Firstline operations to Pinnacle.  These efforts included obtaining an employee list from Plaintiffs and contacting Firstline operations staff.

165.    On January 14, 2008, Plaintiffs learned of a suit filed on January 11, 2008, wherein GE and other plaintiffs desired that the court appoint a receiver to protect the assets of Firstline for Firstline creditors.

166.    On the evening of January 16, 2008, Ryan Mitchell of Bennett Tueller Johnson and Deere, an attorney for Pinnacle, sent by email two letters to Jason Crandall, attorney for Plaintiffs.

167.    One letter was merely a reminder of the terms of the loan from Christofferson to Plaintiffs.

168.    The other letter purported to be a termination by Pinnacle of the non-binding terms of the LOI (hereinafter the "Purported Termination Letter").

22

169.   After receiving a copy of this Purported Termination Letter from Crandall, Thurston contacted Christofferson regarding the Purported Termination Letter.

170.   Christofferson told Thurston that the Purported Termination Letter was merely a formality required to protect Pinnacle from liabilities of Firstline, but that the oral agreement between Plaintiffs and Pinnacle was still in effect.

171.   Christofferson and Zolman repeatedly confirmed to Plaintiffs that the oral agreement was still in effect and continued to encourage Plaintiffs to recruit personnel for Pinnacle.

172.   Christofferson and Walker continued to urge Plaintiffs to help transition the Firstline operations and recruiting offices to Pinnacle.

173.   In furtherance of the oral agreement, and in reliance upon the continued representations regarding the parties' deal, Plaintiffs provided to Pinnacle lists of its sales representatives around the country, together with contact information whereby Pinnacle could contact these representatives and assist in the process of recruiting them to transition from Firstline to Pinnacle.

174.   In furtherance of the oral agreement, and in reliance upon the continued representations regarding the parties' deal, on January 17, 2008 Thurston e-mailed to Christofferson Firstline's entire list of sales representatives and technicians in response to Christofferson's request for that information.

175.   Defendants engaged in interstate telephone communications from Utah to Firstline sales representatives stationed around the United States, including, but not limited to, Frank Brown in Ohio, Ryan Roche in Arizona, and Anthony Defelice in Texas.

176.   On or about January 22, as part of a joint plan for Thurston to recruit sales representatives and technicians to work for Pinnacle Thurston traveled to the Firstline office in College Station, Texas,

23

with Christofferson, Munday, Zolman, Walker and others, to recruit existing Firstline sales and installation personnel for Pinnacle and facilitate the transition of the College Station recruiting office to Pinnacle.

177.    As part of this transition, the parties were to meet with the landlord of Firstline's College Station office to facilitate Pinnacle assuming the office lease.

178.    In the days preceding the trip to Texas Defendants had, by means of interstate telephone communications, arranged various meetings in Texas including meetings with Firstline's landlord and meetings with some of the Firstline sales representatives who resided in Texas.

179.    While in Texas, Thurston spoke to Christofferson, Zolman and Munday about feedback he had received from some of the sales representatives to the effect that Pinnacle, the Pinnacle Owners, and other high level management of Pinnacle had been denying that Plaintiffs were going to be owners of Pinnacle and/or that Plaintiffs would be part of Pinnacle going forward.

180.    Christofferson, Zolman and Munday all assured Thurston that Pinnacle and the Pinnacle Owners remained committed to the deal the parties had reached, and encouraged Thurston to continue his efforts to transition the sales force and other personnel of Firstline to work for Pinnacle.

181.    On January 25, 2008, in response to the pending receivership action, Firstline filed for bankruptcy protection in the United States Bankruptcy Court, District of Utah.

182.    Even after Firstline's bankruptcy filing, Christofferson and Zolman continued to tell Thurston that the oral agreement would be honored, but that the parties needed to keep the agreement quiet to protect Pinnacle from Firstline creditors.

183.    For example, on or about January 28, 2008 Christofferson asked Thurston to provide him with information regarding the "back end" payments that were due from Firstline to the sales representatives and technicians.  Relying upon Christofferson's representation that the deal was still on, Thurston provided that information.

184.    Despite the fact that Plaintiffs were being assured by Christofferson and Zolman that the oral agreement was still going forward, Plaintiffs were still receiving contrary messages from the sales representatives they were encouraging to go to work for Pinnacle; i.e., these personnel were told that Defendants did not intend to allow Plaintiffs to be a part of Pinnacle going forward.

185.    As these contrary messages continued long beyond the time that had been agreed to by the parties, and Defendants refused to make public statements acknowledging the deal between Pinnacle, the Pinnacle Owners, and Plaintiffs,  a large number of Plaintiffs' recruited sales force began to leave Pinnacle and seek a contract to provide summer sales services for other competing companies.

186.    Finally, on or about March 20, 2008 Keyes spoke to Christofferson about how the parties were going to honor the agreement the parties had reached on January 10, pursuant to which Plaintiffs would received an ownership interest in Pinnacle.

187.    Although Christofferson agreed with Keyes that the parties need to get together, he did not offer any solutions for the issue at that time.

188.    The next day, Christofferson called Thurston and made statements to Thurston, including a statement that it would be "illegal" to compensate Plaintiffs for recruiting sales representatives and technicians from Pinnacle to Firstline, that communicated to Thurston that Defendants were not going to

honor their agreement with Plaintiffs and that Defendants were not going to compensate Plaintiffs in any

way for Plaintiffs' efforts in recruiting sales representatives and technicians to go to work for Pinnacle.

### FIRST CAUSE OF ACTION
(Breach of Written Contract – Pinnacle)

189.    Each and every allegation of this Complaint that is not inconsistent with this First Cause

of Action is incorporated herein as if fully set forth herein.

190.    Plaintiffs entered into a written contract with Pinnacle.

191.    The written contract included terms that were binding as of the date on which the

agreement was made.

192.    The written agreement included a binding provision that neither party would disclose or

permit the disclosure of the existence of discussions regarding a possible transaction between Plaintiffs

and Pinnacle, or any of the terms, conditions, or other aspects of the transaction contemplated by the

Plaintiffs, Pinnacle, and the owners of Pinnacle.

193.    Pinnacle breached the written agreement by, among other things, disclosing and/or

permitting the disclosure of the existence of discussions regarding a possible transaction between

Plaintiffs and Pinnacle, and disclosure of at least some of the terms, conditions, and/or other aspects of

the transaction contemplated between Plaintiffs, Pinnacle, and the owners of Pinnacle.

194.    Plaintiffs have been damaged as a direct and proximate result of Pinnacle's breaches of

the written contract.

26

**SECOND CAUSE OF ACTION**
(Breach of Oral Contract – Pinnacle and the Pinnacle Owners)

195.   Each and every allegation of this Complaint that is not inconsistent with this Second

Cause of Action is incorporated herein as if fully set forth herein.

196.   Plaintiffs entered into an oral contract with Pinnacle and the Pinnacle Owners.

197.   Pursuant to the terms of the parties' oral contract, Plaintiffs agreed to actively recruit

independent salespersons and technicians to come to work for Pinnacle.

198.   Pursuant to the terms of the parties' oral contract, the Pinnacle Owners agreed to transfer

to Plaintiffs up to a 32% profits interest in Pinnacle that would entitle Plaintiffs to a voting interest in

Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and in an interest

in the future appreciation and depreciation of the asset value of Pinnacle.

199.   Pursuant to the terms of the parties' oral contract, Pinnacle and the Pinnacle Owners

agreed that Plaintiffs would be employed by Pinnacle, either as employees or as independent

contractors, on substantially the same terms, and receiving substantially the same payment, insurance,

bonuses, and benefits as the Pinnacle Owners, including but not limited to insurance and the use of

vacation properties, sporting and event tickets, vehicles, and frequent flyer miles and points.

200.   Defendants also agreed to assist Plaintiffs immediately in negotiations with Firstline

creditors in order to help give comfort to Firstline creditors that the creditors would be paid as part of the

wind up of Firstline.

27

201.   Plaintiffs and Defendants also agreed to transition Firstline operations and recruiting offices to Pinnacle.

202.   Plaintiffs commenced performance under the contract by actively recruiting independent salespersons and technicians to come to work for Pinnacle, including bringing many of their key contacts in the alarm sales industry to a meeting with Defendants and encouraging their sales force to commence working for Pinnacle during the calendar year 2008 and beyond.

203.   Plaintiffs continued their recruiting efforts by encouraging former Firstline sales representatives and technicians either to enter into agreements with Pinnacle or stay with Pinnacle despite the inconsistent statements of Defendants.

204.   These efforts of Plaintiffs continued up to approximately March 2008.

205.   Defendants breached the contract by failing to assist Plaintiffs in negotiations with Firstline creditors.

206.   Defendants' failure to stand with Plaintiffs and Firstline in negotiations with Firstline's creditors caused Plaintiffs to be unable to resolve the creditors' claims, caused certain creditors to pursue the receivership action, and ultimately led to a bankruptcy filing by Firstline.

207.   Defendants breached the contract by stating to Plaintiffs that Pinnacle was not going to compensate Plaintiffs in the form of salary, bonuses or any ownership of Pinnacle.

208.   Defendants prevented Plaintiffs' further performance under the contract by repeatedly making statements to the sales representatives and technicians recruited by Plaintiffs to work for Pinnacle, which statement by Defendants discouraged said sales representatives and technicians from working for Pinnacle.

28

209.    Defendants' refusal to acknowledge the agreement between Plaintiffs, Pinnacle and the Pinnacle Owners within a reasonable time frame, and their persistent denial to the sales representatives who were loyal to Plaintiffs of Plaintiffs' involvement in the ongoing operations of Pinnacle, made it impossible for Plaintiffs to effectively recruit sales representatives to work for Pinnacle as contemplated by the parties' agreement.

210.    If Defendants had not breached the oral contract, Plaintiffs would have obtained a 32% profits interest in Pinnacle that would have entitled Plaintiffs to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and in an interest in the future appreciation and depreciation of the asset value of Pinnacle.

211.    As a result of Defendants' breaches, Plaintiffs were prevented from obtaining a 32% profits interest in Pinnacle that would have entitled Plaintiffs to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and in an interest in the future appreciation and depreciation of the asset value of Pinnacle.

212.    As a result of Defendants' breaches, Plaintiffs were deprived of the benefits of being employed by Pinnacle, either as employees or as independent contractors, on substantially the same terms, and receiving substantially the same payment, insurance, bonuses, and benefits as the Pinnacle Owners, including but not limited to insurance and the use of vacation properties, sporting and event tickets, vehicles, and frequent flyer miles and points.

213.    Plaintiffs have been damaged by Defendants' breach of contract in an amount to be proven at trial, but in no even less than one hundred fifty million dollars ($150,000,000.00).

## THIRD CAUSE OF ACTION
### (Fraud – All Defendants)

214.    Each and every allegation of this Complaint that is not inconsistent with this Third Cause

of Action is incorporated herein as if fully set forth herein.

215.    As more particularly alleged herein, Defendants made representations to Plaintiffs.

216.    Defendants' representations to Plaintiffs included representations that in return for

Plaintiffs using their efforts to build the sales force of Pinnacle, Plaintiffs would receive a 32% profits

interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits,

losses and distributions from Pinnacle's operations, and an interest in the future appreciation and

depreciation of the asset value of Pinnacle.

217.    Defendants' representations to Plaintiffs included a representation that the sales

representatives and technicians recruited by Plaintiffs to work for Pinnacle would receive the same

compensation as they had previously received working for Firstline.

218.    Defendants' representations to Plaintiffs included a representation that Defendants had

lined up sufficient capital, principally in the form of lines of credit, to enable Pinnacle to open sixty to

eighty additional offices, and to pay the expenses of recruiting sales representatives and technicians to

staff those offices for the 2008 summer sales season.

219.    Defendants' representations to Plaintiffs included representations regarding the ability to

obtain a line of credit from Zions Bank and representations regarding Pinnacle's EBITDA.

220.    Defendants' representations to Plaintiffs included a representation that Defendants would

work with Plaintiffs to appease the creditors of Firstline and help provide assurances that such creditors

would be paid.

30

221.   Defendants' representations to Plaintiffs included a representation that Defendants would provide sufficient funds to enable Plaintiffs to pay the back end payments owed by Firstline to the sales representatives and technicians who had worked for Firstline during the 2007 summer sales season.

222.   The representations made by Defendants to Plaintiffs concerned material facts existing at the time the representations were made.

223.   The representations made by Defendants were false because, at the time Defendants made the representations mentioned herein, Pinnacle did not intend to allow Plaintiffs to obtain a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

224.   Likewise, Defendants never intended to fulfill any of the other representations set forth herein.

225.   On information and belief, Pinnacle did not have the ability to obtain a one hundred million dollar line of credit from Zions Bank.

226.   On information and belief, Pinnacle did not have EBITDA of twenty million dollars.

227.   Defendants knew that the representations they made to Plaintiffs were false, or, in the alternative, Defendants made the representations recklessly, knowing that there was insufficient knowledge upon which to base the representations.

228.   Defendants made the representations alleged herein for the purpose of inducing Plaintiffs to act upon the representations.

31

229.    Defendants made the representations alleged herein for the purpose of inducing Plaintiffs to reject other opportunities they had to raise capital to continue engaging in the business of summer sales of home security systems.

230.    Defendants made the representations alleged herein for the purpose of inducing Plaintiffs to make statements to their sales force that would have the effect of causing the sales force to desire to work for Pinnacle during the upcoming summer sales season.

231.    Defendants made the representations alleged herein for the purpose of inducing Plaintiffs to make statements to their sales force that would have the effect of causing the sales force not to work for an entity (other the Pinnacle) in which Plaintiffs would share in the profits and appreciation in value.

232.    Plaintiffs were ignorant of the falsity of the representations made by Defendants and, in fact, reasonably believed the representations to be true.

233.    Plaintiffs relied upon the representations made by Defendants.

234.    Plaintiffs were induced by Defendants' representations to disclose to Defendants the names and contact information of the sales force they had assembled for the benefit of their own business enterprise.

235.    Plaintiffs were induced by Defendants' representations to introduce their sales force (including sales representatives and technicians/installers) to Defendants.

236.    Plaintiffs were induced by Defendants' representations to encourage their sales force to go to work for Pinnacle.

237.    Plaintiffs were induced by Defendants' representations to encourage the operational staff of Firstline to go to work for Pinnacle.

238.    Plaintiffs were induced by Defendants' representations to cease their efforts to obtain

financing to further the operations of Firstline, to reject other opportunities they had to raise capital to

further the operations of Firstline, and to instead direct their efforts to the successful operation of

Pinnacle.

239.    Plaintiffs were, as a direct and proximate result of their reliance upon the false

representations of Defendants, damaged in an amount to be proven at trial, but in no event less than one

hundred fifty million dollars ($150,000,000.00).

240.    Defendants' conduct as described herein was willful and malicious, and otherwise

manifests a knowing and reckless indifference toward, and disregard of, Plaintiffs' rights, and, as a

result, Defendants should be required to pay punitive damages in an amount sufficient to punish

Defendants for their conduct and to deter them and others similarly situated from engaging in similar

conduct in the future, which amount shall be determined at the trial of this matter.

**FOURTH CAUSE OF ACTION**
(Racketeering Influenced Corrupt Organizations – All Defendants)

241.    Each and every allegation of this Complaint that is not inconsistent with this Fourth

Cause of Action is incorporated herein as if fully set forth herein.

242.    Pinnacle is an "enterprise" as that term is defined in 18 U.S.C. §1961, engaged in

interstate commerce and the activities of which affect interstate commerce.  Such activities in and

affecting interstate commerce include, inter alia, the purchasing and sales of security systems and alarm

monitoring equipment in interstate commerce.

243.    The individual Defendants and other individuals and entities, including Pinnacles sales

representatives and technicians, General Electric corporation, ADT Services AG, Tyco Fire and

33

Security, and Alarm. Com, also constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961, engaged in activities that affect interstate commerce. Such activities include the interstate sales, installation, and monitoring of home security systems.

244.    As alleged herein, Defendants engaged in a scheme to defraud Plaintiffs by making false statements to Plaintiffs which statements were intended to induce Plaintiffs to forego other funding opportunities that were available to them and to weaken and destroy the relationships that existed between Plaintiffs and the cadre of sales representatives that were loyal to Plaintiffs.

245.    Defendants, for the purpose of executing the scheme and artifice to defraud Plaintiffs, and in furtherance of the criminal acts set forth herein, transmitted and caused to be transmitted communications by means of wire.

246.    Such communications transmitted by wire included, without limitation, the following:

a.    Long distance telephone calls from the State of Utah to other states, including without limitation telephone calls from Christofferson to Thurston while Christofferson was in the State of Utah and Thurston was in the State of Hawaii;

b.    Wireless text messages sent from Christofferson in Utah to Thurston in Hawaii;

c.    E-mail communications sent from Christofferson in Utah to Thurston in Hawaii, including without limitation, an e-mail sent by Christofferson on December 14, 2007 in which Christofferson stated, "We are so excited about this. I cant [sic] wait until we can make everything public. I would say that I am excited to have you as a partner, but it seems like the last few years we have already been partners."

34

d.    Interstate e-mail communications regarding the loan from Christofferson to Plaintiffs, which was intended to provide funding to pay certain Firstline obligations pending the time at which Pinnacle would begin to pay directly the operational staff of former Firstline employees that would be coming to work for Pinnacle.

e.    Long distance telephone calls from Defendants in Utah to persons in Texas to arrange for Pinnacle to take over certain operations of Firstline located in the State of Texas;

f.    Long distance telephone calls from Defendants in Utah and Idaho to recruit Firstline sales representatives to come to come to work for Pinnacle;

g.    Electronic mail communications from Defendants to Plaintiffs in furtherance of Defendants' scheme to defraud;

h.    Mobile telephone calls between Defendants and Plaintiffs pursuant to which Defendants made communications in furtherance of their scheme to defraud;

i.    Text message communications from Defendants made in furtherance of Defendants' scheme to defraud; and

j.    Such other interstate communications as may be revealed through the course of discovery and disclosure in this case.

247.    Each use of the wires in furtherance of Defendants' scheme and artifice to defraud Plaintiffs, and in furtherance of the criminal acts set forth herein, constitutes as separate offense.

248.    Defendants, and each of them, aided and abetted the violations of 18 U.S.C. § 1343 (wire fraud) and are therefore criminally liable for the acts of each other.

35

249.    The violations of 18 U.S.C. § 1343 (wire fraud), for the purposes of effectuating the aforementioned scheme to defraud Plaintiffs, which occurred on more than one occasion in the last ten years, constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1962, for which treble damages, costs of suit and attorneys' fees may be sough under 18 U.S.C. § 1964(c).

250.    Defendants, in violation of 18 U.S.C. § 1962(c), conducted the affairs of an enterprise engaged in interstate commerce through a pattern of racketeering activity for which treble damages, costs of suit and attorneys' fees may be sough under 18 U.S.C. § 1964(c).

251.    Defendants and each of them, in violation of 18 U.S.C. § 1962(d), conspired to violate Sections 1962(a) and 1962(c) of Title 18 of the United States Code for which treble damages, costs of suit and attorneys' fees are required under 18 U.S.C. § 1964(c).

252.    Plaintiffs were damaged in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962 alleged herein.

253.    The amount of Plaintiffs' damages shall be proven at trial, but is not less than $150,000,000.00

254.    Plaintiffs are entitled to recover from Defendants not less than $450,000,000.00, that amount being treble the amount of their actual damages, together with their costs incurred in this action, including attorneys' fees.

### FIFTH CAUSE OF ACTION
(Pattern of Unlawful Activities – All Defendants)

255.    Each and every allegation of this Complaint that is not inconsistent with this Fifth Cause of Action is incorporated herein as if fully set forth herein.

36

256.    The conduct alleged herein to constitute violations of 18 U.S.C. § 1962 also constitute

unlawful activity as that term is used in Utah Code Annotated § 76-10-1603 and defined in Utah Code

Annotated § 76-10-1602.

257.    Pinnacle is an enterprise as defined in Utah Code Annotated § 76-10-1602(1) in that it is

a corporation or other legal entity.

258.    The union of Defendants Christofferson, Munday, Barlow, Zolman, Walker, and

Chappell is an enterprise as Utah Code Annotated § 76-10-1602(1).

259.    Defendants have engaged in conduct that constitutes the commission of at least three

episodes of unlawful activity.

260.    Defendants' episodes of unlawful activity, as alleged herein, are not isolated but have the

same or similar purposes, results, participants, victims and methods of commission.

261.    Defendants' episodes of unlawful activity taken together demonstrate continuing

unlawful conduct and  are related to each other and to the enterprises of Pinnacle and the union of the

individual Defendants.

262.    All of the episodes of unlawful activity alleged herein occurred after July 31, 1981.

263.    Without limiting the number and scope of unlawful activities in which Defendants have

engaged, Defendants engaged in at least the acts of communications fraud alleged herein.

264.    Defendants devised a scheme or artifice to defraud Plaintiffs and/or to obtain from them

money, property, and other things of value by means of the false or fraudulent pretenses,

representations, promises, and/or material omissions alleged herein.

265.    At a meeting on January 10, 2008 at which each of the Defendants was present, Defendants represented to Plaintiffs that Pinnacle and its owners would enter into a binding agreement with Plaintiffs pursuant to which Plaintiffs would become owners of up to a 32% profits interest in Pinnacle that would entitle Plaintiffs to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and in an interest in the future appreciation and depreciation of the asset value of Pinnacle and that Plaintiffs would be employed by Pinnacle, either as employees or as independent contractors, on substantially the same terms, and receiving substantially the same payment, insurance, bonuses, and benefits as the current owners of Pinnacle, including but not limited to insurance and the use of vacation properties, sporting and event tickets, vehicles, and frequent flyer miles and points.

266.    Defendant Christofferson, knowing that the representations regarding the intent of Pinnacle and the owners of Pinnacle to enter into the binding agreement was false, omitted to tell Plaintiffs that such statements were false.

267.    Defendant Christofferson, knowing that Plaintiffs understood that Plaintiffs had entered into a binding agreement with Pinnacle and the owners of Pinnacle, omitted to tell Plaintiffs that Pinnacle and the owners of Pinnacle were not entering into a binding agreement with Plaintiffs.

268.    Defendant Munday, knowing that the representations regarding the intent of Pinnacle and the owners of Pinnacle to enter into the binding agreement was false, omitted to tell Plaintiffs that such statements were false.

269.    Defendant Munday, knowing that Plaintiffs understood that Plaintiffs had entered into a binding agreement with Pinnacle and the owners of Pinnacle, omitted to tell Plaintiffs that Pinnacle and the owners of Pinnacle were not entering into a binding agreement with Plaintiffs.

270.    Defendant Barlow, knowing that the representations regarding the intent of Pinnacle and the owners of Pinnacle to enter into the binding agreement was false, omitted to tell Plaintiffs that such statements were false.

271.    Defendant Barlow, knowing that Plaintiffs understood that Plaintiffs had entered into a binding agreement with Pinnacle and the owners of Pinnacle, omitted to tell Plaintiffs that Pinnacle and the owners of Pinnacle were not entering into a binding agreement with Plaintiffs.

272.    Defendant Zolman, knowing that the representations regarding the intent of Pinnacle and the owners of Pinnacle to enter into the binding agreement was false, omitted to tell Plaintiffs that such statements were false.

273.    Defendant Zolman, knowing that Plaintiffs understood that Plaintiffs had entered into a binding agreement with Pinnacle and the owners of Pinnacle, omitted to tell Plaintiffs that Pinnacle and the owners of Pinnacle were not entering into a binding agreement with Plaintiffs.

274.    Defendant Walker, knowing that the representations regarding the intent of Pinnacle and the owners of Pinnacle to enter into the Binding Agreement was false, omitted to tell Plaintiffs that such statements were false.

275.    Defendant Walker, knowing that Plaintiffs understood that Plaintiffs had entered into a binding agreement with Pinnacle and the owners of Pinnacle, omitted to tell Plaintiffs that Pinnacle and the owners of Pinnacle were not entering into a binding agreement with Plaintiffs.

276.    Defendant Chappell, knowing that the representations regarding the intent of Pinnacle and the owners of Pinnacle to enter into the Binding Agreement was false, omitted to tell Plaintiffs that such statements were false.

277.    Defendant Chappell, knowing that Plaintiffs understood that Plaintiffs had entered into a binding agreement with Pinnacle and the owners of Pinnacle, omitted to tell Plaintiffs that Pinnacle and the owners of Pinnacle were not entering into a binding agreement with Plaintiffs.

278.    Defendants made additional false statements in furtherance of their scheme to defraud Plaintiffs, which false statements include but are not limited to those specified elsewhere in this Complaint.

279.    Each of the Defendants, by their conduct alleged herein, communicated directly or indirectly with Plaintiffs for the purpose of executing or concealing their fraudulent scheme or artifice.

280.    Plaintiffs are entitled to recover twice the amount of actual damages they sustained as a result of Defendants' conduct that is forbidden by Utah Code Annotated Section 76-1-1603, as alleged herein.

281.    Plaintiffs are entitled to recover their costs of suit, including reasonable attorneys' fees.

282.    Pursuant to Utah Code Annotated Section 76-10-1695(10)(b), Plaintiffs are entitled to a restraining order, preventing Defendants from disposing of their assets pending a determination of liability.

### SIXTH CAUSE OF ACTION
(Unjust Enrichment – All Defendants)

283.    Each and every allegation of this Complaint that is not inconsistent with this Sixth Cause of Action is incorporated herein as if fully set forth herein.

284.    This claim for unjust enrichment is pled in the alternative to Plaintiffs' First and Second Causes of Action, for breach of contract.

285.    Plaintiffs conferred a benefit on Defendants by encouraging their sales representatives, technicians, and operational staff to go to work for Pinnacle.

286.    Plaintiffs conferred the benefit upon Defendants with an expectation of compensation, in that Plaintiffs expected to receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

287.    Defendants will receive substantial benefit from the work to be performed by sales representatives, technicians, and operational staff.

288.    Defendants knowingly received the benefit from Plaintiffs, knowing of Plaintiffs' expectation of compensation.

289.    Defendants have refused to compensate Plaintiffs for the benefit that Plaintiffs have conferred.

290.    It would be against equity and good conscience for Defendants to retain the benefit conferred by Plaintiffs.

291.    Plaintiffs are entitled to judgment against Defendants in an amount to be proven at trial, which shall be not less than the principal amount of one hundred fifty million dollars ($150,000,000.00), plus pre-judgment interest and post-judgment interest at the highest legal rate and from the earliest date allowed by law.

41

## SEVENTH CAUSE OF ACTION
(Breach of Fiduciary Duty – Christofferson & Barlow)

292.    Each and every allegation of this Complaint that is not inconsistent with this Seventh Cause of Action is incorporated herein as if fully set forth herein.

293.    Christofferson stood in a close, confidential relationship with Plaintiffs and, as such, owed to them fiduciary duties.

294.    Barlow, as an attorney holding himself out as representing Plaintiffs owed to them fiduciary duties.

295.    At a minimum, the fiduciary duties owed by Defendants Christofferson and Barlow included, but were not limited to duties of loyalty, impartiality and prudence, and a duty not to engage in self- dealing.

296.    The acts and omissions of Christofferson and Barlow alleged herein constitute breaches of their fiduciary duties to Plaintiffs of loyalty, impartiality and of her duty to avoid self-dealing.

297.    As a direct and proximate result of Christofferson's breaches of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial.

298.    As a direct and proximate result of Barlow's breaches of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
(Aiding in Breach of Fiduciary Duty – All Defendants)

299.    Each and every allegation of this Complaint that is not inconsistent with this Eighth Cause of Action is incorporated herein as if fully set forth herein.

300.    Defendants, and each of them, knowingly aided Christofferson and Barlow Nolen in breaching their fiduciary duties to Plaintiffs as described above.

301.    As a result of Defendants' aiding Christofferson's and Barlow's breach of fiduciary duties, Plaintiffs have been damaged in an amount to be determined at trial.

**NINTH CAUSE OF ACTION**
(Negligence – Barlow)

302.    Each and every allegation of this Complaint that is not inconsistent with this Ninth Cause of Action is incorporated herein as if fully set forth herein.

303.    Barlow is an attorney, licensed to practice law in the State of Utah.

304.    Barlow held himself out to Plaintiffs as acting as an attorney on their behalf.

305.    Barlow knew that up to the time of the January 10th Meeting, Plaintiffs had been represented by an attorney, Jason S. Crandall, in connection with the negotiation and drafting of an agreement between Plaintiffs, Pinnacle, and the Pinnacle Owners.

306.    During the January 10th Meeting, Barlow did not advise Plaintiffs that they should invite their attorney, Jason S. Crandall, to participate in the discussion and advise them with respect to the matters discussed.

307.    Notwithstanding the requirements of the Utah Rules of Professional Conduct, Barlow engaged in discussions with Plaintiffs regarding matters on which Barlow knew Plaintiffs had been represented by Mr. Crandall, and did so without obtaining Mr. Crandall's consent.

308.    During the January 10th meeting, Barlow advised Plaintiffs regarding what statements they should make the following day to the sales force they were attempting to recruit to work for Pinnacle.

309.    As a result of Barlow's conduct alleged herein, and as a result of the discussions between the parties at which Mr. Crandall was not present, Plaintiffs reasonably believed that Barlow was their attorney, and was representing them in connection with the oral agreement between Plaintiffs and Pinnacle.

310.    An attorney-client relationship existed between Barlow and Plaintiffs.

311.    As a result of the attorney-client relationship that existed between Barlow and Plaintiffs, Barlow owed duties to Plaintiffs to provide legal services meeting the standard of care required of attorneys towards their clients.

312.    Barlow breached his duty by failing to ensure that the agreement between Plaintiffs and Defendants was documents sufficient to clearly record the nature of the parties' agreement.

313.    In the alternative, if it should be determined that there was no oral agreement between Plaintiffs and Defendants, Barlow breached his duty to Plaintiffs by failing to ensure that Plaintiffs properly understood the absence of an agreement, the legal effect of the absence of an agreement, and their rights and privileges under the circumstances.

314.    Barlow breached his duties to Plaintiffs by purporting to undertake to represent their interests when those interests were in conflict with the interests of Defendants, whom Barlow also represented.

315.    In the alternative, if it should be determined that no attorney-client relationship existed between Barlow and Plaintiffs, Barlow owed a duty to Plaintiffs not to engage in discussions with Plaintiffs outside the presence of Mr. Crandall regarding matters on which Barlow knew Plaintiffs had

been represented by Mr. Crandall, including but not limited to matters relating to the proposed and actual business relationship between Plaintiffs, Pinnacle, and the owners of Pinnacle.

316.    Barlow breached his duty not to engage in discussions with Plaintiffs outside the presence of Mr. Crandall regarding matters on which Barlow knew Plaintiffs had been represented by Mr. Crandall, including but not limited to matters relating to the proposed and actual business relationship between Plaintiffs, Pinnacle, and the owners of Pinnacle.

317.    Barlow's acts as alleged in this Complaint constitute negligence.

318.    As a direct and proximate result of Barlow's negligence, Plaintiffs have been damaged in an amount to be proven at trial.

### TENTH CAUSE OF ACTION
(Negligent Misrepresentation – All Defendants)

319.    Each and every allegation of this Complaint that is not inconsistent with this Tenth Cause of Action is incorporated herein as if fully set forth herein.

320.    Defendants each had a pecuniary interest in the transaction between Plaintiffs, Pinnacle, and Pinnacle's owners.

321.    Defendants were each in a superior position to know the material facts regarding Pinnacle's intention to enter into a contract with Plaintiffs, and the other material facts alleged herein.

322.    Defendants represented to Plaintiffs that Pinnacle and the owners of Pinnacle did intend to enter into an agreement with Plaintiffs pursuant to which, in return for Plaintiffs using their efforts to build the sales force of Pinnacle, Plaintiffs would receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from

Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

323.   Defendants failed to disclose to Plaintiffs that Pinnacle and the owners of Pinnacle did not intend to enter into an agreement with Plaintiffs pursuant to which Plaintiffs would receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

324.   In the alternative to the allegations contained herein that Plaintiffs and Defendants did enter into an oral contract, Plaintiffs allege that on January 10, 2008, Pinnacle and the Pinnacle Owners did not intend to enter into an agreement with Plaintiffs pursuant to which Plaintiffs would receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

325.   Defendants carelessly and negligently made the representations referred to herein and/or failed to disclose material information known to Defendants.

326.   Defendants knew or reasonably should have foreseen that Plaintiffs were likely to rely on the representation that on January 10, 2008, Pinnacle and the Pinnacle Owners did intend to enter into an agreement with Plaintiffs pursuant to which Plaintiffs would receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

327.   The fact of whether on January 10, 2008, Pinnacle and the Pinnacle Owners actually intended to enter into an agreement with Plaintiffs pursuant to which Plaintiffs would receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle was material.

328.   Plaintiffs reasonably relied upon Defendants' representations that on January 10, 2008, Pinnacle and the Pinnacle Owners intended to enter into an agreement with Plaintiffs pursuant to which Plaintiffs would receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

329.   Plaintiffs reasonably relied upon Defendants failure to disclose that Pinnacle did not intend to enter into an agreement with Plaintiffs pursuant to which Plaintiffs would receive a 32% profits interest in Pinnacle that would entitle them to a voting interest in Pinnacle, an interest in the profits, losses and distributions from Pinnacle's operations, and an interest in the future appreciation and depreciation of the asset value of Pinnacle.

330.   Plaintiffs were damaged by their reliance upon Defendants' careless and negligent misrepresentations and failures to disclose.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants jointly, separately and individually as follows:

47

A.      On Plaintiffs' First Cause of Action for judgment in Plaintiffs' favor against Pinnacle for damages arising from its breach of contract, in an amount not less than one hundred fifty million dollars ($150,000,000.00), together with prejudgment interest, court costs and attorney fees;

B.      On Plaintiffs' Second Cause of Action for judgment in Plaintiffs' favor against all Defendants for damages arising from their breach of contract, in an amount not less than one hundred fifty million dollars ($150,000,000.00), together with prejudgment interest, court costs and attorney fees;

C.      On Plaintiffs' Third Cause of Action, for judgment in Plaintiffs' favor against Defendants for damages arising from Defendants' fraud, the amount of which shall be proven at trial, and which are not less than one hundred fifty million dollars ($150,000,000.00), together with punitive damages in an amount sufficient to punish Defendants for their conduct alleged herein and to discourage them and others similarly situated from engaging in such conduct in the future;

D.      On Plaintiffs' Fourth Cause of Action for judgment in Plaintiffs' favor against Defendants for treble the amount of damages arising by reason of Defendants' violations of 18 U.S.C. § 1962, which amount is not less than four hundred fifty million dollars ($450,000,000.00) together with interest, court costs, and attorney fees;

E.      On Plaintiffs' Fifth Cause of Action,  for damages in an amount equal to twice the amount of actual damages Plaintiffs sustained as a result of Defendants' conduct that is forbidden by Utah Code Annotated Section 76-1-1603, as alleged herein, together with costs of suit, including reasonable attorneys' fees;

F.      On Plaintiffs' Fifth Cause of Action, for a a restraining order, preventing Defendants from disposing of their assets pending a determination of liability;

48

G.    On Plaintiffs' Sixth Cause of Action, for damages in an amount, as proven at trial, equal to the amount by which Defendants have been unjustly enriched;

H.    On Plaintiffs' Seventh Cause of Action, for damages resulting from the breach of fiduciary duty by Defendants Barlow and Christofferson, the amount of which shall be proven at trial, and which are not less than one hundred fifty million dollars ($150,000,000), together with punitive damages in an amount sufficient to punish Defendants for their conduct alleged herein and to discourage them and others similarly situated from engaging in such conduct in the future;

I.    On Plaintiff's Eighth Cause of Action, for damages resulting from the breach of fiduciary duties in which Defendants aided, the amount of which shall be proven at trial, and which are not less than one hundred fifty million dollars ($150,000,000), together with punitive damages in an amount sufficient to punish Defendants for their conduct alleged herein and to discourage them and others similarly situated from engaging in such conduct in the future;

J.    On Plaintiff's Ninth Cause of Action, for damages caused by Barlow's negligence, the amount of which shall be proven at trial, and which are not less than one hundred fifty million dollars ($150,000,000);

K.    On Plaintiff's Tenth Cause of Action, for damages caused by Defendants' negligent misrepresentations, the amount of which shall be proven at trial, and which are not less than one hundred fifty million dollars ($150,000,000);

L.    On any cause of action for which punitive damages are available, for such punitive damages in an amount to be proven at trial, but no less than an amount sufficient to punish Defendants

49

for their conduct alleged herein and to deter Defendants and others similarly situated from engaging in similar conduct in the future.

M.    For attorneys fees incurred by Plaintiffs in obtaining the foregoing relief.

N.    For court costs and all other expenses incurred in bringing this action.

O.    For interest on all amounts awarded by the Court, computed from the earliest date and at the highest rate allowed by law.

P.    For such other and further relief as the Court deems just under the premises.

DATED this 25 day of April, 2008.

SUMSION & CRANDALL

Grant M. Sumsion
Jason S. Crandall

Plaintiffs' Addresses
Wright Thurston
6263 Bull River Rd.
Highland, UT 84003

Trevor Keyes
10360 Grayrock Ct.
Sandy, UT 84092

50